IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TAYLOUR ANGERER                )
                               )
           Plaintiff,          )   Civil Action No. 13-227E
                               )
    v.                         )
                               )
MICHAEL ASTRUE,                )
                               )
           Defendant.          )

# OPINION

## *I. Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Taylour Angerer ("Plaintiff" or "Claimant") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-434 and 1381-1383f (2012). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") was erroneous and that the Commissioner's decision was not supported by substantial evidence as required by 42 U.S.C. § 405(g).

To the contrary, Defendant argues that the ALJ properly evaluated the entire record and determined that despite numerous severe impairments, Plaintiff retained a Residual Functional Capacity ("RFC") to perform a wide range of sedentary work. [ECF No. 13 at 10]. Therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

1

The Court has reviewed the record in its entirety and for the reasons stated below, we will deny the Plaintiff's Motion for Summary Judgment and grant the Defendant's Motion for Summary Judgment.

## *II. Procedural History*

The Plaintiff filed applications for DIB and SSI on October 1, 2010 (R. at 153-68, 188) alleging disability since May 1, 2009, due to short bowel syndrome ("SBS"), anemia, vitamin B-12 deficiency, dysthymic disorder, and panic disorder (R. at 21; R. at 24). Plaintiff's claims were denied at the initial level of the administrative review process on March 29, 2011 (R. at 21). Plaintiff requested a hearing on April 12, 2011 (R. at 21). ALJ David F. Brash conducted a *de novo* video hearing on February 24, 2012 (R. at 21). Present at the hearing was Vocational Expert ("VE"), Fred A. Monaco (R. at 21). On March 2, 2012, the ALJ determined that Plaintiff was not disabled under Section 1614(a)(3)(A) of the Social Security Act (R. at 21-31). The ALJ stated, "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a)." (R. at 27).

On April 24, 2012 Plaintiff filed a timely written request for review by the Appeals Council (R. at 16), which was denied on May 29, 2013 (R. at 1-5), making the ALJ's decision the final decision of the Acting Commissioner. An appeal was subsequently filed by Plaintiff who seeks review of the ALJ's decision.

## *III. Medical History*

> Plaintiff was born 12 weeks premature and underwent bowel resection for necrotizing enterocolitis at 3 days of age, and bowel reanastomosis at age 6 months. She has had repeated hospitalizations for recurrent abdominal pain and obstructions. Her problems include dumping syndrome, anemia, vitamin

deficiencies, and intolerance to certain foods. Her weight is 106 pounds and her height is 61 inches. (R. at 71-72).[1]

Plaintiff was born on February 12, 1990. Plaintiff's initial surgeries took place at Children's Hospital in Pittsburgh (R. at 253-55) four days after birth. On April 9, 1990 Plaintiff was transferred to St. Vincent Health Center for follow up care for post-surgical effects and prematurity (R. at 257-260). On June 4, 1990 Plaintiff returned to Children's Hospital of Pittsburgh for the closure of Ileostomy (R. at 261).

From October 16-24, 1990 Plaintiff was admitted to the hospital for malabsorption (R. at 321).

On December 9, 1990 Plaintiff was seen at Saint Vincent Health Center for viral gastroenteritis (R. at 265). She had been vomiting and had diarrhea for four to five hours. She was admitted to the hospital for fluids and follow up care (R. at 267-68). She was discharged on December 12, 1990.

On December 17, 1990 Plaintiff was readmitted to Saint Vincent Health Center with vomiting, diarrhea, and dehydration (R. at 309). She was discharged on December 27, 1990 to go to Children's Hospital of Pittsburgh for evaluation of a possible milk allergy (R. at 311).

Plaintiff was admitted to Children's Hospital of Pittsburgh from December 27, 1990 to January 6, 1991. She initially struggled with gaining weight but eventually began gaining again when baby foods were reinserted back into her diet (R. at 683-84). Plaintiff underwent many tests, none of which were conclusive for the cause of her vomiting and dehydration.

On January 11, 1991 Plaintiff was readmitted to Saint Vincent Health Center for vomiting, diarrhea, and dehydration (R. at 387). X-rays were taken of her abdomen at this time. The following impressions of the x-ray were reported by Dr. Floyd R. Hyatt:

---

[1] We note here that there is a discrepancy in the record. The record also states that the Plaintiff's bowel resection surgery occurred when she was 4 days old and that the reanastomosis occurred at 4 months.

3

Three is no free air within the peritoneal cavity. There is moderate gaseous dilatation of right colon and portions of the transverse colon. Note is made of some apparent free intramural air within the right colon wall laterally and about the region of the colon in the pelvis. This is compatible with pneumatosis intestinalis. This could be idiopathic. Possibility of an enterocolitis is certainly a consideration and clinical correlation is recommended. (R. at 470).

Plaintiff's abdomen was x-rayed on a regular basis to diagnose abnormalities. Plaintiff was diagnosed with pneumatosis which resolved (R. at 474). Hospital staff was unable to insert an IV for fluids so a "cut down" had to be performed. Plaintiff stayed in the hospital for an extended stay to attempt to increase her caloric intake, improve her diaper dermatitis, and monitor her bowel movements (R. at 381-474). A consistent note in her record was "Failure to Thrive." On the twenty-fifth day, Plaintiff was discharged from the hospital (R. at 477). Upon discharge it was recommended that Plaintiff have her carbon dioxide levels checked (R. at 479).

April 28, 1991 Plaintiff was admitted to Saint Vincent Health Center for vomiting and mild dehydration. Abdominal x-ray showed multiple dilated loops of bowel (R. at 486). She had a diagnosis of ileus and an NG tube was placed for suction and she was kept NPO and given IV hydration. She had two loose stools and discharged the next day (R.at. 482).

Plaintiff was hospitalized from May 6, to May 13, 1991 at Children's Hospital of Pittsburgh. In a report to Saint Vincent Health Center, Dr. Samuel Kocoshis reported that Plaintiff is experiencing growth failure but that testing revealed no unusual findings. He did diagnose an allergy to cow's milk protein but found Plaintiff tolerated all other foods. He did not note any malabsorption issues but rather noted that follow up should be cognizant of the possibility of an intermittent distal small bowel obstruction which can be attributable to adhesions and such entities as internal herniae (R. at 682).

On May 27, 1991 Plaintiff was once again admitted to the hospital with vomiting 9-10 times in two hours. Plaintiff having been diagnosed with a milk allergy had not had any milk but

had tried an egg yolk for the first time (R. at 505). Discharge from the hospital was on June 3, 1991 (R. at 505) with a diagnosis of (1) Acute egg allergy; (2) enteritis; (3) milk allergy; and (4) short bowel syndrome (R. 507). At the hospital a barium contrast was taken. A large amount of barium was placed in the stomach and passed rapidly into the small bowel without evidence of pylorospasm. The mucosal folds in the duodenum and proximal ileum are thickened suggesting the possibility of a malabsorption process or possibility of cystic fibrosis. Distal small bowel loops are dilated but transit time through the bowel to the colon is within the range of normal and no functionally significant stricture is identified. The vast majority of the barium is identified within the colon within 6 hours following the study and the majority of the barium is seen in the colon 2 hours following the study (R. at 533).

On June 18, 1991 Plaintiff's mother brought her to Saint Vincent's Health Center because Plaintiff only had one bowel movement and said she felt like she needed to go but couldn't. An x-ray revealed negative results and Plaintiff was discharged with directions to push fluids (R. at 593-94).

On October 13, 1991 Plaintiff was seen at Saint Vincent's Health Center for bilateral ear pain, mild gastroenteritis and dermatitis of the scalp. Plaintiff was told to drink clear fluids and provided with prescription antibiotics and shampoo and discharged (R. at 597-98).

On April 16, 1992 Plaintiff visited Saint Vincent's with a cold and was having difficulty breathing. She was discharged without treatment (R. at 603).

On April 23, 1992 Plaintiff visited Saint Vincent's Health Center with left otitis media and bilateral conjunctivitis (R. at 600). She was prescribed antibiotics and discharged.

On October 21, 1992 Plaintiff presented for a milk challenge test. She had a diagnosis of record of microcolon and status post milk induced protein losing enteropathy (R. at 535). Plaintiff tolerated milk test without incident (R. at 536).

On March 13, 1999 Plaintiff was admitted to Saint Vincent's Health Center for acute gastroenteritis and partial small bowel obstruction (R. at 553). Plaintiff had a nasogastric tube inserted for stomach distention. It was later removed and Plaintiff was discharged on March 17, 1999 (R. at 555).

On July 4, 1999 Plaintiff presented to Saint Vincent's Health Center with an itchy red rash on her face, neck, trunk, and arms. She was diagnosed with allergic dermatitis perhaps due to exposure to a dog. She was given medicine and discharged (R. at 604).

April 12, 2001 to April 14 2001 Plaintiff was admitted to Saint Vincent's Health Center for a partial small bowel obstruction (R. at 608). She had been vomiting and had diarrhea for four days (R. at 609). She was treated and released.

October 4, 2001 Plaintiff reported to Saint Vincent's Health Center with abdominal pain and distension. Intake thought it to be a possible twisting of the bowel, but an abdomen x-ray series did not find any abnormalities (R.at 724). She was treated with clear fluids and discharged (R. at 720).

January 27, 2003 Plaintiff presented with diarrhea and nonproductive cough. Plaintiff's mother stated, "Whenever she has diarrhea like this, if she does not rest her bowels for 24 hours, [she] will develop bowel distension similar to [an] obstruction." (R. at 641). She was treated for acute dehydration due to short gut syndrome (R. at 641). She was provided with the following assessment and plan:

> (1) Acute viral illness, upper respiratory infection, likely exacerbating her sensitive bowel with history of short gut syndrome. At this point in time will

6

check RSV and influenza, she has not had her vaccine, and viral cultures and treat symptomatically. (2) Dehydration secondary to (1). The patient has already been given a bolus of normal saline in the emergency department. Will replace her deficit as if it were 5S with D5 half normal saline and recheck a BMP in the a.m. (3) Diarrhea, likely related to short gut syndrome. Will heme test her stool times 3 and keep the patient n.p.o. at this point in time until she is reassessed in the morning. (R. at 649).

On April 16, 2007 Plaintiff reported to Saint Vincent's Health Center with complaints of abdominal pain. Plaintiff said she thinks she may have drunk too much coke and Jell-O (R. at 695). Plaintiff was experiencing nausea and vomiting. Test results showed no abnormalities. She was treated with fluids and discharged.

January 22, 2008 Plaintiff visited Children's Hospital of Pittsburgh for a GI consultation with Dr. David Keljo. Plaintiff's mother reported that a question has been raised that Plaintiff may have a loop of bowel in her abdomen that may be causing her problems with intermittent obstruction (R. at 670). The doctor ordered a barium enema and an upper GI and small bowel follow through (R. at 670). Doctor planned to also check for a vitamin deficiency (R. at 670).

The findings of the Barium enema revealed a "[d]iffusely distended small bowel on the post evacuation image likely related to the patient's history of short bowel syndrome and bowel resection." (R. at 675). There were no abnormalities identified on the upper GI series or small bowel follow through in a patient with a history of short gut syndrome (R. at 676).

On February 4, 2008 Plaintiff and her family sought a surgery consult with Dr. Aviva Katz at Children's Hospital of Pittsburgh (R. at 679-80). Dr. Katz reported that Plaintiff was well developed and has reached her developmental milestones appropriately (R. at 679). She also reported that Plaintiff's time between meals and bowel movements has increased and Plaintiff is able to sleep through the night without having a bowel movement (R. at 679). Based on the

7

barium test, the surgeon saw no reason for surgery and suggested the use of Imodium or Lomotil to increase transit time (R. at 680).

October 25, 2010 Plaintiff attended a follow up visit at Community Health Net. Plaintiff reports being tired despite being prescribed iron supplement. Plaintiff reported psychosocial stressors causing her panic attacks and sudden episodes of palpitations, shortness of breath, and chest pain. Doctor E. Jason Grande prescribed Clonazepam for now but if symptoms persist he would suggest moving her to psychotherapy (R. at 793).

On December 1, 2010 Plaintiff visited Community Health Net for a follow up. Plaintiff reported easy fatigability and that she had no energy but denied feelings of depression (R. at 785). Plaintiff reported panic attacks (R. at 785).

On December 29, 2010 Plaintiff attended Community Health Net for a follow up. Plaintiff continued to complain of fatigue for almost two years. Labs were performed – a CBC as well as a TSH – all lab results were returned normal. The report stated that B12 injections were working (R. at 792). Dr. Grande believed that Plaintiff may suffer from dysthymia but Plaintiff declined medication until after the holidays. A refill for iron and a prescription for Augmentin for a respiratory tract infection were prescribed (R. at 792).

On January 17, 2011 through January 20, 2011 Plaintiff was admitted to Saint Vincent's Health Center for a partial small bowel obstruction. An x-ray revealed fluid distention of almost all the entire small bowel. There was some fluid distention of the ascending and transverse colon (R. at 761). Some areas of narrowing in the sigmoid colon likely reflecting areas of spasm but doctor indicated they should be followed (R. at 762). Plaintiff also had secondary diagnoses of chronic fatigue, alopecia, and a history of pernicious anemia (R. at 726). Plaintiff was treated

with IV fluid and a G-tube which was set at low suction. She was placed on n.p.o. (R. at 726). Surgery was not necessary.

April 18-19, 2011 Plaintiff attended Saint Vincent's Hospital Emergency Department complaining of vaginal bleeding. Plaintiff was 11 weeks pregnant had intermittent bleeding for 5 hours. Primary diagnosis was missed abortion (miscarriage) (R. at 799).

Plaintiff provided the following lists as her current medications: 1000 mcg of IM B12 for severe/critical deficiency; 1000mcg of Vitamin B12 IM injection for severe deficiency; 325 Iron Sulfate for Pernicious Anemia; Imodium for loose runny frequent stools, and vancomycin iv for c difficil (R. at 195).

### *Summary of Testimony*

Claimant's past work history includes the position of packer from June 2008 through April 2009, server from August 2007 through June 2008 and again she was a server in April of 2009 (R. at 75, 193). The most recent work of Plaintiff was as server/dietary aid at Niagara Village, a retirement community, intermittently on a part time basis from May 16, 2009 until March 10, 2011. However due to her medical conditions, it was reported that she frequently fell asleep at work (R. at 245). Claimant alleged performing few, if any, household chores. Plaintiff performs occasional cooking, house cleaning, and laundry (R. at 215). Plaintiff needs no help in personal care or with handling her finances (R. at 215, 216). The overall evidence suggests that she has the ability to care for herself and maintain her home. She does not attend physical therapy. She does not require an assistive device to ambulate. She does not use a Tens unit. She has not been prescribed narcotic medication for any claimed impairment (R. at 71).

Plaintiff describes her daily routine as, "I wake up at 4:00PM. Get ready for work. I go to work from 5:25-7:30. I go home, eat, and nap until 10-11. Shower. See friends, or play on the

9

computer and go to bed at 3:00AM." (R. at 213). Plaintiff further states that she has always had her complained of condition but it is getting progressively worse and she sleeps most of the day and part of the night after work (R. at 214).

Plaintiff lists her limitations as follows: Not able to lift more than 20 pounds, knees go out from kneeling, eyesight is worsened each year, can't concentrate or remember (R. at 218). She notes pain in her head, neck, shoulders, and back (R. at 221). Plaintiff takes Tylenol two times a day and says it sometimes relieves the pain for a couple hours (R. at 222). She wears a wrist brace for work and has never attended physical therapy (R. at 222).

On January 21, 2011 Dr. John J. Kalata, a non-treating consultative physician examined Plaintiff. Dr. Kalata's physical examination of Plaintiff was reported as generally normal (R. at 771-777). He noted some abnormalities of the abdomen that included tenderness and mild distension that may need follow up (R. at 69). He also noted some slight musculoskeletal abnormalities (R. at 69). The following medically determinable impairments were found: Severe Granulomatous Colitis, severe affective disorders, and severe anxiety disorders (R. at 69). However, the affective and anxiety disorders did not satisfy the diagnostic criteria for the listings (R. at 69-70) [See ECF No. 13 at 11-16]. He noted the following:

> IMPRESSION: 1. Recurrent abdominal pain with recurrent incomplete bowel obstruction. 2. Probable massive abdominal adhesions. 3. Remote history of necrotizing enterocolitis as a neonate status post resection and re-anastomosis, with ongoing residuals: A. Dumping syndrome. B. Chronic vitamin B12 and other vitamin deficiencies. C. Possible malabsorption. 4. Anxiety disorder with panic attack. 5. Dysthymia versus clinical depression. 6. History of memory loss and organization lack, likely secondary to previous B12 deficiency. 7. Residual of previous right ring finger injury. 8. Metromenorrhagia. 9. Diminished visual acuity bilaterally despite corrective lenses. 10. History of cold intolerance and hair loss, rule out hypothyroidism. 11. Tobacco, abuse, chronic. (R. at 777).

Dr. Kalata states that Plaintiff can only lift and carry up to 10 pounds frequently, and 20 pounds occasionally due to fatigue. She can only stand and walk for 1-2 hours and can only sit

3-4 hours. He also reported she is limited in her lower extremity (R. at 780). Dr. Kalata reported that "the claimant is limited in standing, walking, lifting, carrying, sitting, pushing and pulling. She can occasionally bend, kneel, stoop, crouch and balance but should never climb." (R. at 67 and 781). Finally he stated that she should be restricted from working with heights and moving machinery (R. at 781).

The Disability Report from the Field Office stated:

> Taylour was born 12 weeks early. She has had 5 surgeries which resulted in short bowel syndrome. The part of the bowel removed was the section which absorbs vitamins and minerals. This has caused her to have severe deficiencies which cause migraines, tooth erosion, poor eyesight, memory problems, balance issues, persistent loose stools, exhaustion and several other concerns. She has been an inpatient approximately 52 times since her birth. Taylour has had numerous tests and medications. She has been dealing with a true milk protein allergy which limits the amount of and type of food she is able to eat. She is unable to work full time due to these issues. Taylour was diagnosed with Organic Failure to thrive as a baby and was on SSI. SSI would allow Taylour to be able to access the appropriate medical professional and medications to keep her alive. Without the medication and regular supervision of her conditions she could die. (R. at 199).

In contrast to the reports above, Plaintiff's Physical RFC findings were she could occasionally lift 20 pounds and frequently lift 10 pounds, she could sit, stand or walk with normal breaks about 6 hours in an 8 hour day, and she had no restrictions for pushing or pulling. (R. at 71). Two doctors, Dr. George Ondis, Ph.D., a DDS psychologist, and Dr. Reynaldo Torio, a DDS physician reviewed Plaintiff's matter (R. at 28).

Dr. Torio provided the following statement:

> The residual functional capacity assessment partially reflects the opinion of John J. Kalata, D.O. The residual functional capacity assessment reflects certain aspects of the opinions contained in the report received . . . . The nontreating source states in the report that the claimant is limited in lifting, carrying, standing, walking, sitting, pushing, pulling and climbing and that she should avoid exposure to heights and moving machinery. These observations are fairly consistent with other evidence in the file. . . . Therefore, the report submitted by John J. Kalata, D.O., . . . is given appropriate weight. (R. at 72)

Dr. Ondis found Plaintiff to have sustained concentration and persistence limitations, and found her moderately limited in this area. He further found her moderately limited in her ability to maintain a schedule, and regular attendance as well as her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms (R. at 73).

Nevertheless, overall Dr. Ondis found:

> The claimant can make simple decisions. The claimant is able to carry out short and simple instructions. Although somewhat limited in this regard by her psychiatric impairments, the claimant is able to maintain concentration and attention for reasonably extended periods of time when performing routine and repetitive work. The claimant would be able to maintain regular attendance and be punctual within reasonable expectations when provided a consistent work schedule. The claimant would not require special supervision in order to sustain an ordinary work routine. The claimant would be expected to complete a normal week without exacerbation of psychological symptoms when performing routine and repetitive work within a consistent work schedule. (R. at 73)

Dr. Ondis only found Plaintiff to be moderately limited in her ability to interact appropriately with the general public (R. at 73). He also found her moderately limited in her ability to respond appropriately to changes in the work setting (R. at 74).

## *IV. Standard of Review*

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to

substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F) (2012).

## V. Discussion

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(1); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [Sh]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the

13

claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent her from performing her past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering her residual functional capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In this case, The ALJ determined that the claimant has the following impairments: short bowel syndrome, anemia, vitamin B-12 deficiency, dysthymic disorder, and panic disorder (R. at 24). However, he determines that the Claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 4040, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d0, 404.1526, 416.920(d), 416.925, and 416.926) (R. at 25). The ALJ, in his report, takes great care in considering each impairment, both physical and mental, with regard to the listings and provides substantial evidence as to why the impairments do not qualify Plaintiff for benefits (See R. at 25-26).

The Commissioner, moving forward, uses the sequential evaluation process and determines at step (4) that the Plaintiff has no past relevant work (R. at 30) and at step (5) that the Plaintiff has not met her burden of proof that she cannot work in some capacity in the national economy. The Commissioner relied on the ALJ's determination that despite the Plaintiff's impairments, Plaintiff retained the capacity to perform a full range of sedentary work (R. at 27).

The ALJ also determined the Claimant's statements are not credible to the extent they are inconsistent with his RFC assessment (R. at 28). "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence, and limited effects of these symptoms are not credible." (R. at 28). While certainly the Plaintiff had a difficult start to life with frequent and extended hospital stays, the record lacks a recent medical history that would support her symptoms interfering with her ability to work. There are simply no medical reports or doctors who provided any evidence that Plaintiff's condition is debilitating. Despite the lack of supporting medical evidence, the ALJ took an exceedingly conservative approach and assigned Plaintiff the following allowances when requesting comment from the VE:

> After careful consideration of the entire record, the [ALJ] find[s] that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(b). The claimant may never climb ladders, ropes or scaffolds, but she may occasionally climb ramps and stairs. She may occasionally balance stoop, kneel, crouch, or crawl. Due to her impairments, the claimant must avoid even moderate exposure to unprotected heights, dangerous machinery, and like hazards. She is limited to understanding, remembering, and carrying out simple instructions and performing simple, routine, tasks. She may have only occasional and superficial interaction with co-workers and the public that does not involve transactional interactions, such as sales or negotiation. The claimant is limited to a low stress work environment, which means involving no production rate paced work, but, rather goal oriented work with only occasional and routine changes in the work setting. (R. at 27).

With these restrictions in mind and based on the VE's testimony, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy and, therefore, was not disabled under the Act (R. at 31). More specifically, the VE testified that given all the factors involved in Plaintiff's case, she would be able to perform the requirements of representative occupations such as billing and posting clerk (80,000 jobs nationally), credit checker (48,000 jobs nationally), and order clerk (101,000 job nationally) (R. at 31). The ALJ

questioned the VE about whether those positions would still be available to a person who would need to leave the work area for short bathroom breaks. The VE responded that the positions could accommodate such a need (R. at 61-61). After further inquiry by the ALJ, the VE said that there would be no jobs in the economy that could support a person being off-task 25% or falling asleep on the job (R. at 62).

In support of her motion for summary judgment, Plaintiff argues that the ALJ's decision summarily dismisses the Plaintiff's allegations regarding her impairments and erroneously fails to adequately evaluate whether the Plaintiff functionally meets the listed impairments in any way [ECF Nol. 9 at 8]. We disagree. We believe the ALJ laboriously covered each impairment and meticulously explained why each of Plaintiff's symptoms failed to meet listed criteria.

Plaintiff further contends that the ALJ focused on mental impairments rather than physical impairments and uses Plaintiff's ability to perform household chores as an indication that she is able to work [ECF No. 9 at 8] "Performing household chores is very different from working eight hours a day in a labor-intensive job." Stroman v. Astrue, 2009 U.S. Dist. LEXIS 10491, 147 SSR 73 (Nov. 4, 2009). On the other hand, activities of daily living are relevant and may be considered in evaluating a claimant's symptoms. See 20 C.F.R. § 416.929(c)(3)(i). We believe that the ALJ gave adequate consideration to Plaintiff's mental capacity, especially in light of the dearth of information on the record regarding her anxiety and dysthymia issues. In addition, we find the ALJ properly considered the Plaintiff's daily life activities in relation to her ability to work.

Finally, Plaintiff takes issue with the weight the ALJ gives the medical opinions from Drs. Ondis and Torio, while giving less weight to Dr. Kalata the consultative examining physician [ECF No. 9 at 9]. The opinions of non-examining medical sources are to be "weighed

by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions than are required for treating sources." (Social Security Rule 96-6p).

> [B]ecause nonexamining sources have no examining or treating relationship with [the Plaintiff], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F. R. § 416.927(c)(3).

Generally more weight is to be given to the opinions of an examining source than to the opinions of non-examining sources, and even more weight is generally given to the opinions of the treating source. See 20 C.F.R § 416.927(c)(1) and (2). The Third Circuit precedent provides that the ALJ must analyze all relevant, probative evidence and provide adequate explanation for disregarding evidence. See Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001); Burnett v. Commissioner, 220 F.3d 112, 121-22 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981).

In this case we have no recent or relevant comment from treating physicians with the exception of Dr. Grande who is treating Plaintiff's mental conditions in a conservative manner thus far. Dr. Kalata is the only examining (albeit consultative) physician on record. However, his report is seemingly reliant on Plaintiff's own testimony of her condition, which when viewed against the record or lack thereof, is overstated. Finally, we have the testimony of Drs. Ondis and Torio who reviewed Plaintiff's record and provide their opinions which are most consistent with Plaintiff's

current medical history. We believe the ALJ properly weighed each physician's testimony.

The claimant bears the burden of proving not only that she has an impairment expected to result in death or last continuously for a year, but also that it is so severe that it prevents her from performing any work See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); Bowen v. Yuckert, 482 U.S. 137, 147 (1987). The Commissioner evaluates a disability claim by considering whether the claimant (1) is working; (2) has a severe impairment; (3) has a listed impairment; (4) can return to his past work; and (5) can perform other work. See 20 C.F.R. §§ 404.1520, 416.920. As stated above, in the Commissioner's analysis she reached the question of whether Plaintiff could perform past work or any other work in the economy. Should the Commissioner satisfy step 4, then the Plaintiff bears the burden of proving that his RFC or limitations are that which do not allow for any work in the national economy. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976). Moreover, the ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ, as fact finder, has the sole responsibility to weight a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

When the medical evidence of record conflicts, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Plummer v. Apfel, 186 F. 3d 422, 429 (3d Cir. 1999). The ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, and not on the basis of the Commissioner's own judgment or speculation, although he may afford a treating physician's opinion more or less

weight depending upon the extent to which supporting explanations are provided. See Plummer, 186 F.3d at 429.

We find that the ALJ provided substantial evidence for his determination that Plaintiff could perform a full range of sedentary work taking into account her various impairments. Plaintiff's complaints alone do not serve to provide a medical record that will support a determination of disability. There must be medical evidence from treating physicians, examining physicians, and non-examining physicians or some combination of the three that agrees with the claims that Plaintiff makes to support a finding of disability. In this case we have a plethora of information from Plaintiff's infancy and childhood that substantiates her claims. However, Plaintiff's recent records indicate bouts of illness and fatigue but no ongoing treatment that would demonstrate that the Plaintiff is disabled. The report of Dr. Kalata provides the most support for Plaintiff's case, but on its own, and in light of the other medical evidence of record, it does not support a determination of disability. Therefore, it is our opinion the ALJ's determination is supported by substantial evidence of record.

## *VI. Conclusion*

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's Motion for Summary Judgment is granted. The Plaintiff's Motion for Summary Judgment is denied. An appropriate order will be entered.

Date: July 29, 2014

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc: counsel of record